Good morning. First case on the docket is 5-13-452 at the Estate of Ellis. Counselor, I think there's also versus NEH. Ready to proceed? Yes, Your Honor. May it be good? My name is Lloyd Donald Hules and I'm the appellant in this matter. And the reason I'm here today is because I personally believe that in this case the safeguards that our system has set up for probate actions have not been followed in this case. And because of those safeguards being absent here, we have three different issues coming up under this 304B1 appeal of a final order determining rights in a probate action. In this realm, you're not going to find any evidence of a client meeting with an attorney, telling the attorney what his wishes are. You're not going to find any evidence that someone walked into an attorney's office and the attorney helped supervise the execution of a will. What you're going to find here is the absence of all those things. This all started with Mike Yates talking to the decedent and then talking to his own father. Mike Yates is a nephew-in-law of the decedent. Mike Yates talked to his own father and they talked about how Mike Yates was going to be able to get the other side of the farm, which is 120 acres. And out of this conversation, Mike and his dad decided that they were going to handle this matter. Mike Yates made a phone call to Dick Ellis, the decedent, and he told him, We're just going to put it in your will that I get the 120 or I get that side of the farm for $100,000. So Mike told him that. I want to jump back and talk about the decedent, Dick Ellis, a little before we go forward. Dick Ellis was an individual who was born in the early 1930s in the Great Depression. He got a second or third grade education in the 1930s. His life spanned a long time. He ended up living into our 21st century. I submit that a second or third grade education in the 1930s is probably less than a kindergarten education today because he never learned to read. He never learned to write. These were on top of his physical ailments, mental faculties, and other things. These were disabilities that he had a hard time coping in the 21st century with. He lived on a family farm with his parents his entire life until they died. He lived on their first farm. Then he moved to their second farm, which we're talking about now in Illinois. And at that farm, his mother lived in a white house. He lived across the road in another home. He depended on his family to take care of his business his entire life. We had four or five nieces and nephews testify. We had two or three grandnieces and nephews testify. We had nine kids testify and a caregiver. All these people had one thing in common. The thing they had in common was they all helped Dick Ellis with his things that he did over the time of his life, especially his business dealings and his physical care. During this time, he continued to live. He tried to do attractive business. We have testimony that during that time in the 50s, 60s, Robert's boys, his nephews, helped him with that. We have testimony that Mike Yates moved to this farm from Joliet where he was living in, I think, the 70s when he was in his teens. He moved and lived with Joanne, and that's Dick's wife, and Dick. Joliet passed away in about 1983 from cancer. And so Mike lived on this farm, and he eventually got married and moved to a trailer at the beginning of the farm. Still lived there, helped him with his dealings. But Joliet, I think the testimony came out, Joliet helped him take care of the business of the farm during the time she was alive. Mike continued to live there and take care of it, but he did move off the farm, got his own little place three acres south of the farm. Mike Yates lived there, helped take care of Dick, and his testimony was he took care of him for 34 years. Testimony was he had a trusting and confidential relationship with him. He admitted this in his pleadings. He had a relationship, taking care of him, 33 years he said once, 25 another. He was there taking care of him the whole time. Although Dick Ellis did tell other people that Mike had already been paid for what he had done. He told the Robert's witnesses, and that testimony came out. Let me fast forward to Dick's condition. In about 1994, his health started going downhill. The caregiver testified it always went downhill and never got better. And so in about 2000, the first things that we see about him is that he had trouble remembering. He spent a summer going to see Russell Sullivan at his job, and he told him the same thing every day over the course of the summer. He couldn't remember that he'd been there the day before. Later that year, he had a perfectly good white house on the farm he lived in, the old farmhouse, perfectly good house. He even redid it when he moved in, in the kitchen and stuff. This house, he had somebody spray a bug bomb, and he got the idea that that bug dote, he called it, was still in the home, and that it was uninhabitable. He moved out, moved to a hotel, stayed in the hotel for about two to three months, I believe. And then he got a double-wide parked in the yard and lived in there. He had strict rules, he wouldn't allow tools to come out of the old house. He believed that old house was useless. Very good asset with value, he believed it had no value whatsoever. He moved into that double-wide, and he also had phobias about microwaves happening, things of that nature, things that just aren't realistic. And Mike Yates termed it as he had a delusion about the white house and the bug doping. With that said, we fast-forward to the time about 2006, 2007, when this will was made. His condition hadn't gotten any better, he was going downhill. He was on, this whole time, approximately 20 pills at a time, including hydrocodone, which he was taking four times a day. He did take that on February 16th, the day the will was executed. Let me ask you about the will, if I could. Wes Wilkins, an attorney, wrote the will, correct? That's the testimony that came out, yes. And that was at the request of Mr. Yates? Yes, Your Honor. And the decedent never went to Mr. Wilkins' office? That's correct, Your Honor. He never went to his office or talked to him. But the will contest, Mr. Wilkins also represented Mr. Yates? That's correct, Your Honor. Was Mr. Wilkins ever called as a witness? Yes, he was. So he was a lawyer witness in the proceedings? Yes, he was, Judge. Okay. And what I'm saying is we don't have the normal things you have in a will contest here. We have Mike Yates deciding to get a hold of Mr. Wilkins. And he picks Mr. Wilkins. Mr. Ellis had no prior dealings with Mr. Wilkins. Mr. Wilkins testified that he never represented him in his life. And when that happened, Mike Yates made the appointment, went in, talked to Mr. Wilkins, told him what to put in the bill, and they decided, I think between the two of them, how they were going to get us started on the bill. And suddenly, somebody gets a will from an attorney in Cape Verde that had been done in 2002. And there's no testimony. There was an authorization form. There's no testimony. Dick Ellis contacted them. There was nothing. But this will shows up. They take this will. And according to them, in the will, there was never anything in the record that said that first will was ever witnessed or read to him. There was no testimony whatsoever authenticating that first will. Part of our argument is, is the court should not have considered that first will or allowed any evidence whatsoever. Would you go into the execution of the will? Okay. The will was executed. Mike Yates, on February 15th, called up and he got a call from Wes Wilkins. He's got the power of attorney. He goes down and picks up the power of attorney. Somehow that day, he gets Dick Ellis to go to the county clerk's office and sign the power of attorney. The next day, February 16th. Who has to have the power of attorney and who prepares the power of attorney? Wes Wilkins prepared the power of attorney. Mike Yates picked that power of attorney up at his office, and he arranged to have Dick Ellis transported to the county clerk's office, where that power of attorney was notarized on February 15th, 2007. On February 16th, he gets another call from Wes Wilkins saying, I've got the will down. He goes to his office, and he meets with Wes Wilkins himself. He talks to Wes Wilkins about that will. He talks to him about how to get it executed. Wes Wilkins testifies. He gives him three options. The best is bring him into my office. Does he arrest the witnesses? We'll do it here. Second best is, I'll go out there with my witnesses. Third option he gives him is to take the will, get your own witnesses, and get it done. And Mike Wilkins, or Mike Yates, picks the third option. He picks that option himself, and he takes the will out there. But on his way, he testifies that he immediately took it out there. But on the way, there's testimony that he's in a car with a co-worker, and we believe it's on the way because if he took it immediately there, the co-worker says he was in the car, and Mike said, I finally got the will done. And he shows him the manila envelope. And so he gets out there, and he goes to the home. We believe it was around 1130 in the morning. Mike says it's 330, but when he answered that question, he closed his eyes on the testimony, and he kept that in the transcript. But he takes the will, and Helen Williams is there visiting her uncle on February 16, 2007. She thinks Mike come in around noon, and he starts yelling at Dick Ellis, telling him, you're going to sign this back, and he takes out the manila envelope. And Dick starts crying, and she can't excuse. Helen Williams is scared for her safety, and she leaves. So we have him there, and he denies that he was there at that time of day. He has a good witness, Susan Nige, who adopted his appellate brief two to three months before it was ever written or filed in this court. That's how good of a witness she is for him. And she adopted his appellate brief. She testified that when asked, when did Mike Eats get there on February 16, 2007, she testifies, a little before noon. Nobody ever corrected that. Nobody ever asked another question about it. She testified a little before noon. So we believe he was lying about when he was being there because he was trying to cover up what he did. But nonetheless, his story, if you believe him, his story is he gets out there about 3.30, and on the way he calls his two witnesses, two of the neighbors, people he knows, and he gets them out there. And they testify that they talked to Dick, and one story has them read two provisions out of the will. I think another story maybe he read three. Mike Eats read two to three paragraphs out of the will to Dick. Dick resonated with greed. Nobody else read anything to him. They talked about the explanations that went on and really how to execute the will is what Mike was telling everybody how to do it. Where do you sign? When do you sign? Those sorts of things. Can you explain your relationship to the deceased? Yes, he's my great-uncle. And you are an heir. Yes. And now Susan Nottage, was she an heir as well? She's a caregiver, and she is in the will to give five acres and a half. And so the will gets executed out there with Mike Yates and the two witnesses there. But if we talk about meeting the presumptions at the beginning of the case, we've got to talk about clear and convincing evidence for them to prove to get past those presumptions. And in this matter, there is no clear and convincing evidence. There's two stories about this execution of a will. One is you've got two witnesses and Mike, two out of the three witnesses. One doesn't know if she was there, if Susan was there. The other two witnesses stated that she wasn't in the hallway, she wasn't in the living room, she wasn't in the kitchen. She wasn't looking through the window and she wasn't hiding in the closet. They ruled out she was anywhere to be found. Did anybody testify to whether the entirety of the will was read to Mr. Ellis? Yes, they did, and they testified that it was not. No one testified that the entire will was read? That's correct. Neither of the two witnesses are Susan Nottage? That's correct. The best that we got was Mike Gates saying two to three paragraphs were read. And do you know what paragraphs they contended were read? Well, they're contending the changes from the 2002 will. And that's all that they read or they determined needed to be read. The earlier will, was that the original supposedly that was taken to Mr. Wilkin's office? Yes, it was. Okay. I'm sorry, didn't read about the administration? Yes, there was a paragraph put in about independent administration by Mr. Wilkins that was never read to him, ever. And so the evidence came down that Susan Nottage claimed she was standing in the kitchen while they all witnessed this will, while they're all stating she was not there. I submit to the court that I believe that that will signing never went down that afternoon. I think it went down how Mike played it. Mike said when he was yelling at Dick Ellis earlier that day that I'm just going to go get the boys to sign it. And that's what I believe. When we come down to this, you know, we have this testimony. And the court in this scenario basically went about halfway with its decision on undue influence and never really touched the tip of the iceberg on three other ways to get there. Undue influence, we have four ways to get there in this case. We have direct undue influence, which is the manifest way to the evidence. Then we have the second, which is a presumption of undue influence pursuant to the IPI constructions. Then we have a third undue influence. This court is upheld in the Schmidt v. Swearer case. And then we have a fourth undue influence that is basically there's a presumption of fraud when there's a transaction between a fiduciary and a principal. Mike Gates admitted he had an auction contract to purchase this property for $100,000 whenever that will was signed. He was a fiduciary at the time by virtue of law with the power of attorney. But even if we don't want to count it like the judge in that case wrongly did, he said it doesn't count because it was the day before and he didn't use it. It's not about counting it or using it. It's about having that power. It's why the court has the safeguards up, because you have the power and you have a chance to abuse it. And in this case, if we look at that situation, even if we throw out that power of attorney, he still had a fiduciary relationship because we believe everything Mike tells us. He was contacted, but he says he was contacted by Dick Ellis, and he was asked to prepare a will. That is giving someone total fiduciary. Did the court ever acknowledge that a presumption had arisen? You know, I believe they did. Whenever there was a motion for direct authority in the middle of the case, the court went through everything on the record, and I thought they found a presumption from our evidence. That's my reading of it. And I argued the law of the case doctrine is appellate versus trial court. But in this case, can a judge change his mind in the middle of the case? I think he found that we had a prima facie case, and a prima facie case is what they say establishes a presumption. So I believe that he did find that, and I believe that somewhere along the line he lost that presumption. And it's totally obvious to any fact finder that whenever you have an answer and you have a person in court admitting they had a fiduciary relationship four to five times, how can a court find there was no fiduciary relationship? We have evidence in the record that says Dick was dependent on me. I took care of him 30 to 40 years, and the court found that Dick wasn't dependent on me. That's obvious. I'm going to switch gears just a little bit to get something cleared up. Of the two witnesses that were there allegedly at the signing, they don't stand to gain anything from the will, correct? Correct. But Susan Nottage does, and obviously Yates does. Yeah, they do. Okay. Yeah, they both do. And the two witnesses are neighbors. They don't stand to gain anything directly, but they are good friends with Mike. One of them testified, Mike cut wood for him the week before the hearing. He's the coworker? No, he's the neighbor. He cut wood for him? What does that mean, he cut wood for him? He cut wood for him. He cut wood. I'm sorry. Yes. But, yeah, so, you know, what we have here is we have undue influence. The court went on the part about being dominant in that. I mean, we have evidence of Mike being dominant. Dominance isn't about coming up to somebody and saying, I'm going to beat you up if you don't do this. That's direct undue influence. We wouldn't need a presumption if that was the standard. Dominant means you're in a dominant role, and it's whenever somebody gives you powers. And if we look at Mike here and believe everything he says, it did give him a lot of power to dispose of all of his assets over the period of his life. Was there any expert testimony regarding his mental or physical state? No. Talk about a lot of prescribed drugs? No, there wasn't. Had an effect? Now, there were stories that when he took these drugs that he did fall asleep, and that he did talk about things in his childhood and things of that nature. But those were just personal observations. And there was a witness who said that he was confused on February 16th. And there was another witness that said he took his regular four doses of hydrocodone that day. Four doses and how long a time? A day. So I guess every four to six hours, depending on how long he was awake. And he had done this for a long period of time. I think the testimony was he took painkillers for years. And so if we couple in his inability to read, his inability to see those things, I mean, it's evident that he didn't understand the contents of that will. And Pepe versus Caputo says if it's not read to him, then it can't be upheld as their will. Is there any testimony or any evidence that he said, Well, this is my will, and I want you to sign as a witness for me. Witness my signature. I guess he did an X. I don't know what he did. He signed it. Did he ask them to witness it? My recollection is he thanked them for coming to the house. He never specifically said thank you for witnessing my will, and he never said and asked them to come and witness my will. He never acknowledged that it was his will. And, in fact, the testimony was. Go ahead. Finish your last thought. His testimony was that day that he told the other people he had to sign this document so Mike could take care of hospital or doctor type stuff. Okay. That's it. Thank you. You'll have rebuttal. Counsel. Are there any of the facts that you disagree with? Judge, there are several facts I would disagree with with respect to the testimony. And would the court like for me to highlight those at this point? Yes, please. All right. Judge, first of all, the court has looked at the testimony the trial court did and weighed all that evidence. The court in its order specifically outlined the evidence and the testimony of each individual witness in this particular case. This theory that Mr. Hewson has submitted to the court is a good theory, but it's not based on what the record shows that the evidence was at court. Your Honor, Dick Ellis was a unique individual who lived to be 81 years old. This will was written two and a half years before he passed away. And the testimony before the trial court was that he was a very strong-willed person, a person who was not dominated in any way, shape, or form, even up through and past the time that this will was executed. The testimony before the court by every witness virtually was that you could not change his mind and you couldn't tell him how to do things because he was very dominant. Judge, Mr. Hewson is asking the court here to overturn basically this case based on a factual interpretation. I think one thing I would like to address first is as to the standard of review in this case. In the original brief that was filed by Mr. Hewson, he stated that the manifest way of the evidence was the standard that this court was to use. Then in the reply brief, he expanded that and is asking the court to use a de novo standard of review. The appellee would submit to you that the manifest way of the evidence is the appropriate standard in this particular case. What is being asked is that the court look and make sure that the trial court applied the law correctly to the facts that were presented to the trial court. There is no issue, to the best of my understanding, I haven't heard Mr. Hewson argue it, as to an interpretation of the law, which is what de novo review involves. We would ask the court to use the manifest way of the evidence standard in this particular case. We believe when you do, you will affirm the lower court ruling. Now, there's three particular issues that he's drawn. And I'd like to speak to the facts. I'd like to go back to the court's inquiry in each of these. The first one is they allege that there was a lack of testimony capacity. As the court knows, the testator is presumed to have sufficient mental capacity to make a valid will. And his sanity and soundness of mind is presumed until proven to the contrary. There's no question in these facts, and you will never hear me argue, that Dick Ellis was not aged, he was feeble, and he was very dependent. There's no question that he was dependent. He was dependent for years, for decades. But the fact of the matter is the court reviews the evidence that the trial court looked at, there is multitudes of evidence where Dick Ellis was not dominated by anyone. In fact, he carried on his ordinary business, even in that state, for decades. In fact, in the trial brief, which is taken from the transcript, there are 17 examples of how he continued to conduct ordinary business on a day-to-day basis. Even though he was dependent on Susan Nottage and Mike Yates and others to help him live, he was not dominated by them. There's a huge distinction, we submit, between being dependent and being dominated by someone. And I'll speak to that in just a second. Mr. Wilkins, did you know that at the time you wrote the will? Did I know what, Your Honor? That this gentleman was aged, feeble, independent. Yes, I did. And so you knew, did you know that he couldn't read or write? I did know that, yes, I did. And you wrote the will for Mr. Yates. Didn't that kind of sound a bell for you? Did you have a question in your mind? Why are you here without the gentleman? In some respects, except that I knew Mr. Yates, I knew him to be an honorable person, and I believed that he was conducting the wishes of Mr. Ellis. That's the only reason that I did that. Okay, and then you gave him the will, and he went out the door, and that was it for you? Except that I explained to him if they were going to execute it, how it could be executed as Mr. Hewson had stated, and that's correct. So did you testify to him? I did testify. At the same time you were representing Mr. Yates? Yes. Did you mail a bill to Mr. Yates for the will? No, I did not. And what was the testimony as to how it was paid for? I don't recall a testimony as to how it was paid for. But was that question asked, do you recall that? I don't recall if it was asked, to be honest with you. Mr. Yates did not pay me for writing the will. Well, how about this power of attorney? I noticed that it took a long while for you to write the will. Correct. And then somehow power of attorney came first. Were you asked by Mr. Yates to draft that as well? Or was that something that you felt was important? Mr. Yates advised me that previously in 2002, there had been a will done by another attorney. And whenever I was instructed to prepare the will, as we did in 2007, according to what Mr. Ellis had told Mr. Yates, then there was a power of attorney also prepared at that point in time as a matter of a statement. So I'm not sure I understand. Was the power of attorney executed in 2002 and you were updating it? No. No. The power of attorney was done in 2007 at the same time that the will was done. Was that your idea? It was instructed to me that that needed to be done, and Mr. Ellis was also requesting that document to be prepared. Is the power of attorney in the record? The power of attorney? I don't recall, to be honest with you. Do you recall what type of power of attorney it was? Was it for a specific action? No, it was a general power of attorney. It was a general power of attorney. And how do you understand the first will was obtained? The 2002 will? Yes. The testimony before the trial court was that Mr. Ellis, at that point, was able to drive, that he drove himself and Susan Nottage, who was his caregiver, to an attorney in Cape Girardeau whose name was Mark Johnson, and that he had instructed Mark Johnson how to prepare that will. The testimony also was from Susan Nottage that Mr. Ellis came down from Mr. Johnson's office and in the lobby of that building, he showed her provisions in that will that protected her interest in a home on his property if he would continue to take care of her. Do you know how Mr. Yates came to have the will? Mr. Yates advised, and the testimony was that Mr. Yates told me that Mr. Ellis wanted a will prepared exactly like the 2002 will with a couple of changes, and that 2002 will was obtained from the office of Mark Johnson that previously had been executed by Mr. Ellis. Is that the way you ordinarily have prepared wills without the testator being there? I would say that's not ordinary. Have you ever done it in any other circumstance? I have done it this way before on occasion, but it's not ordinary. And the changes that were made between the 2002 will, did they continue to provide for Ms. Nottage? They continued to provide for Ms. Nottage. They continued to list 13 other family members of Mr. Ellis that were in the other will. The only primary change was with respect to a farm that was changed as to who the beneficiary was, who in this case became Mr. Yates. Did you recognize at the time you made that change that the value of the farm was four times what it was being bought for? Did you know that at all? No. I understood that it was probably more valuable. I was not overly concerned about that because I understood the relationship between Mr. Ellis and Mr. Yates. Mr. Yates had been a caregiver and had been as a family member of Mr. Ellis for some four decades, so I understood that he may be wanting to give him something because of that relationship. Did you know that there was a contract for the purchase of that ground? I did not know there was none. Oh, you didn't. Do you believe as an attorney representing Mr. Yates that Mr. Yates had a fiduciary duty to the testator? To do what, I'm sorry? A fiduciary duty. Do you believe Mr. Yates had a fiduciary duty to the testator? I'm sorry. A fiduciary duty to do what, I apologize? To the decedent, to the man who wrote the will. I do not believe that he had a fiduciary duty to Mr. Ellis, no. Even if he was buying the property? No, I do not believe that he was. And I believe that the trial court was correct. When the trial court looked at all of the testimony and heard all of that testimony, essentially what the court determined was that while there was a relationship, a dependent relationship without question, there was no fiduciary relationship because the law says essentially that to be a fiduciary relationship, the beneficiary has to be dominant over the other party. And there was not sufficient evidence according to the trial court, and I agree with the trial court, to show that Mr. Ellis was ever dominated in any way, shape, or form by Mr. Yates. In fact, if you look at the Hoover case, it basically says that for undue influence to be present, it has to be such as to destroy the testator's freedom. There is no evidence whatsoever in this case that was presented either by our witnesses or by Mr. Hill's witnesses that Mr. Ellis's freedom of choice was ever destroyed in this case to do what he needed to do with respect to his property. Now, if I may address this issue as well, the court did not find that there was prima facie evidence of undue influence. If the court had, it would have switched the burden of proof to me to clear and convincing evidence to show that I had basically beaten back that rebuttable presumption. If the court looks in the transcript, pages 299 and 300 of the transcript, I made a direct and derogatory motion. At that time, the court basically found that, and used the words, that there was a prima facie case on each of the three issues that Mr. Huelsen had submitted. But he went on to say in there that that was for the purpose of the direct and derogatory motion. As this court knows, it's a different standard of proof. The court has to view the evidence that had only been presented by Mr. Huelsen at that point in time in a light most favorable to him to determine whether the case should stop at that point and go forward. The court made a determination and says in the transcript that there was enough evidence on all of those to go forward. However, the court then goes on in its written order and specifically says that undue influence had never been proven and there had never been this fiduciary relationship. As the law defines it, established by Mr. Huelsen. Now, lastly, with respect to the lack of the knowledge of the contents of the will. As the court knows, the execution of the will, according to Illinois law, is prima facie evidence of having understandingly executed it. The evidence in this case is clear. The whole will is not read to me. There's no doubt about it. Do you contest that he was illiterate? No, no question. I would think that even though there's a perception the execution validates the will, if someone is acknowledged to be illiterate, there's no way they would know what that will contained. Except that there is case law, Your Honor, that basically says the fact that a person can't read does not necessarily validate the will. In this particular case, the testimony was that was twice testified to by the witnesses, one whenever there was a formal proof hearing for the will to show it was witnessed. And then at the trial was these two witnesses who came. Yes, they were friends of Mike Yates, but they also were neighbors of Dick Ellis. They knew him. They had previously seen him before they interacted with him. And their testimony was they talked to him before, they talked to him after he signed the will. He seemed fine. In fact, they both testified that he was of sound mind. The testimony is that Mike Yates read to him and explained to him the changes under the premise that everything else in the will was the same as the 2002 will, which had been prepared by Mark Johnson at the direction of Dick Ellis. So it's not as if this document was just put in front of him and he was told to sign it. He was explained that these are the changes that were made as you directed, and he acknowledged that that's what he wanted to do. The testimony is that he signed the will that he initially. There's been no testimony. There's no challenge that he did sign the will. There's no challenge that those were his initials at any point in time. Now, there's also a question here about testimony that he didn't know what he was doing. He wasn't confident. The fact of the matter is there is not one single witness that was put forward by the objector in this case, with the exception of one who testified that they were even around Mr. Ellis at the time that he signed this will. The only one that they put forward was Helen Williams, and Helen Williams said she saw him the day that he signed the will, a few hours before. However, the trial court made note of the fact that she never expressed an opinion as to whether she thought he was of sound mind. And her testimony was directly refuted by five other witnesses that the court heard, and when Wayne had evidence, the court gave those witnesses more credibility and more weight. I'm trying to figure out who the fifth one was. Two would be the witnesses that witnessed the will. Right. The other was Mike Yates. Was Connie Yates his wife? Connie Yates. The fifth witness was Susan Nottage. Okay. Okay. Those are the five witnesses. And I realize there's a lot of pieces to this puzzle. Now, these changes that were read to him, allegedly, by Mr. Yates, correct? Yes. Was that in the presence of the witnesses? Yes. Yes. And they testified that they heard him read those changes to Mr. Ellis at that point. And, Your Honor, lastly, I would just say there also was no evidence in this case whatsoever that if Mr. Ellis didn't know what he was doing, if Mr. Ellis was in such bad shape, there's no evidence that at any point anyone tried to have a guardianship established or say that he was incompetent. That was not done anywhere in this case. There's no evidence of that, which speaks volumes in the appellee's opinion as to the fact that everybody recognized that he was well in charge of taking care of his own business until after it was discovered that the will had been written two years before he died and was not maybe the way everybody thought it was. So, Your Honor, based upon that argument, I thank you for your time. I would ask the court to affirm the lower court decision and find that the court did not abuse its discretion and that the manifest way of the evidence does not require overturning the trial court decision. Thank you, counsel. Rebuttal. Like this matter started out with Mike Yates calling Dick Ellis and said, well, just put it in your will that I get to buy the house for $100,000. Mike also described his actions to a coworker on his right that day, February 16, 2007. Keep in mind, the family never knew about this will until after Dick Ellis died. Mike Yates described to his coworker that the family thinks I'm screwing them in this situation, but I could screw them more by charging a 15% executive fee. Mike described his actions as screwing them. That would seem to me to be undue. Now, when you look at testimony, Helen Williams did testify that Dick Ellis was confused on February 16. The other witnesses who testified to a leading question basically said was he of sound mind. There's a legal definition that has many factors to sound mind, and I believe it's the same thing. A leading question is only as good as the facts that are asked. And so if it's a legal conclusion by those individuals, then that's not a very good description of his mind that day. Now, we've had a lot of discussion here about that 2002 will. Why I want the court to be really skeptical about this, in a Schlinger case, the court said we can't consider a will that hasn't been proved with basically our safeguards and our probate law. If you look at the answer of Mike Yates filed in the trial court, and it's in A32 of the appendix, he says the executor, Mike Yates, admits that he had done with the 2002 will, Mike Yates, as he had done with the 2002 will, Mike Yates assisted the deceitful in having a revised will prepared. That's why we should steer clear of this 2002 will. He admits in his answer that he was involved in making that 2002 will also. There's been no testimony about that will being proven, and it could be that if he's involved there, there was undue influence on that part. So we shouldn't consider that will or that he was ever read those provisions back in 2002. As far as I'm not getting a guardianship, it was a group effort to take care of Dick Ellis. The family did it. Everybody involved, every testimony he could read, they were all involved in helping. He was very dependent, and there was domination. Mike Yates, if you believe everything he says, had the power to get this will done. He had the power to choose the attorney. He had the power where this was going to be executed. He had the power to pick the witnesses. Whenever a relationship with two people, one person gives power to the other person, that other person becomes in a dominant role and can make decisions for them. Mike Yates also had an education. He was way past the second or third grade of the 1930s education. He had an advantage in that position also, and he could read. And he had the role that he could take advantage, and in this case, we submit that he did. Mr. Hewlton, do you think a power of attorney creates a fiduciary relationship? Absolutely. It creates one and only one the minute that it is signed and put into play because that puts the person in a dominant role. And there's been courts that have considered whether they used it or not, and I believe the decisions come down that it's automatic as a matter of law once it's signed. Thank you. But in this case, we're here today because the safeguards of our system have not been upheld, and if we had the usual testimony that we see in these cases, we'd have an attorney talking about how they talked to him, how he was competent, and you'd have disinterested witnesses. But we have a witness, Mr. Inman, who testified he's been a neighbor for 10 years, and Mr. Ellis didn't recognize him that day, and Mike Yates had to introduce him to his neighbor of 10 years. And we're talking about in the country, so we're talking about, you know, it's a neighbor probably a quarter mile away, but yet that's your next-door neighbor. And he didn't recognize him that day, and Mike Yates had to introduce him. So we believe that with the combination of his lack of education and the drugs he was on and his health, that he didn't know what he was doing that day, and when it wasn't read to him, he wasn't able to know the contents of that will. And if we look at the case law, Wompacher just says there's no presumption just because somebody can't leave. We're not going on a presumption here. We're going under the fact that he didn't have it read to him. The other part is if you look at the other thing, there is a presumption sometimes when there's no imposition. In this case, we have imposition from day one. We have Mike Yates imposing his will by saying, we're just going to put it in your will. I can buy the property for $100,000. It was his idea from the beginning to make this will, and he followed through with it and did everything along the way. So, thank you. Thank you, counsel. In case you'll be taking that advice, you'll be notified of the results.